UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FRANK ROSSELLO, on Behalf of Himself and All Others Similarly Situated, | ) Case No. |
| | ) |
| | ) |
| *Plaintiff*, | ) CLASS ACTION |
| | ) |
| v. | ) |
| | ) |
| KELLY J. GILL, WALLACE E. OLSON, CHAD A. MCCURDY, WILLIAM C. O'NEIL, JR., RICHARD M. BRAME, and ROBERT Z. HENSLEY, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

**SHAREHOLDER COMPLAINT BASED UPON SELF-DEALING AND BREACH OF FIDUCIARY DUTY**

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by plaintiff on behalf of holders of common stock of Advocat Inc. ("Advocat" or the "Company") against the Board of Directors of Advocat (the "Board" or the "Defendants").  This action arises out of the Defendants' breaches of fiduciary duty in entrenching themselves in their positions and the harm they have thereby caused to the Class (as defined herein).  As detailed herein, the Board breached its fiduciary duties when in response to expressions of interest in a potential strategic transaction from Covington Investments, LLC ("Covington"), it failed to negotiate or otherwise appropriately consider Covington's proposals.  This action seeks equitable relief compelling the Board to properly exercise its fiduciary duties and ensuring an open and fair process to maximize Advocat shareholder value.

2.     On May 11, 2012, Covington publicly disclosed that it had made a proposal to acquire Advocat for $8.50 per share (the "Offer").  In its announcement, Covington revealed that it first approached Advocat about a strategic transaction on February 27, 2012.  Between that time and its public announcement, Covington made two additional attempts to engage the Board in meaningful discussions regarding a potential transaction.  Covington has gone so far as to state that it is willing to increase its offer price if Advocat allows it to conduct due diligence and the due diligence reveals that Advocat is worth more than what Covington offered.  Yet, despite the cooperative and non-coercive nature of Covington's advances, the Defendants have refused to negotiate or even interact in any productive manner with Covington.

3.     The Board's actions are even more unconscionable given the recent deterioration in Advocat's business and financial results.  In addition to Advocat's increasing professional liability expenses, which are crippling the Company's financial results, Advocat is facing serious regulatory, reimbursement, and business headwinds.  The largest impact comes from recent changes in

government reimbursement. Specifically, in August 2011, the Centers for Medicare & Medicaid Services ("CMS") issued a final regulation that reduced Medicare payments to all skilled nursing facilities beginning October 1, 2011, by an estimated 11.1%. Indeed, just two days prior to the public announcement of the Offer, Advocat reported a first quarter net loss of $1.5 million as it coped with higher costs and lower reimbursement. Advocat's earnings per share have been negative for the twelve-month period ending March 31, 2012.

4.      In spite of all these damaging factors, Covington has repeatedly communicated its interest in acquiring the Company at a price that maximizes Advocat shareholder value. Covington's Offer represents a 96% premium over the closing price of Advocat's shares the day before the Offer, a 71% premium over the average price of Advocat's shares over the past thirty days, a 55% premium over the average price of Advocat's shares over the past three months, and a 47% premium over the average price of Advocat's shares over the past three years. Nonetheless, despite the significant hurdles and uncertainties in Advocat's business, and the compelling valuation in the Offer, the Board has refused to even negotiate with Covington.

5.      Due to the Board's refusal to engage in negotiations, Covington was forced to reveal the Offer directly to Advocat shareholders. On May 11, 2012, in the same press release announcing the Offer, Covington disclosed a letter to Advocat's Chairman of the Board and Vice Chairman of the Board, defendants Wallace E. Olson ("Olson") and Chad A. McCurdy ("McCurdy") respectively, from John McMullan ("McMullan"), Covington's President. The press release and letter outlined the background of the Offer and the Board's unwillingness to negotiate, and ultimately allowed Advocat shareholders to consider the Offer for themselves. McMullan explained that Covington was "surprised and disappointed" with the Board's previous failures to explore Covington's proposals, but

stated that Covington remained interested in pursuing discussions "in a mutually agreeable and negotiated manner if possible."

6.     The Board, however, is unilaterally eliminating the chance for any such good faith discussion to occur. On May 14, 2012, Advocat filed a Form 8-Kwith the U.S. Securities and Exchange Commission ("SEC") officially rejecting Covington's Offer. The Board's refusal to negotiate in good faith and present the Company's shareholders an opportunity to fairly consider Covington's Offer is causing substantial harm to Advocat shareholders, and is in violation of its members' fiduciary duties of care and loyalty. In sum, the members of the Board have demonstrated a refusal to act in accordance with the duties prescribed to them by law. Instead, these Defendants have demonstrated a course of action consistent only with their own self-serving motives – namely, creating barriers to a change of control in order to ensure that they will retain their prestigious and lucrative positions with the Company.

7.     In addition to the Board's failure to adequately respond to Covington's Offer against the best interests of shareholders, Advocat also has numerous existing draconian anti-takeover defenses in place. First, Advocat has adopted a "poison pill" that would essentially allow the Board to flood the market with additional shares so that buying the Company in a hostile takeover would become prohibitively expensive and difficult. Here, the poison pill would prevent Covington from acquiring Advocat, regardless of shareholders' support for a transaction. In addition, Advocat's Board is staggered, with certain directors serving different term lengths than others. Having a staggered board deprives Advocat shareholders the power and control that comes from the opportunity to elect the full Advocat Board at any one time.

8.     As detailed herein, applicable law imposes upon the Defendants the obligation to act in the best interests of Advocat and its public stockholders and to ensure that no conflicts of interest

exist that would interfere with that mandate. Accordingly, the Defendants must immediately act to comply with their fiduciary duties by, among other things: (i) ensuring an open and fair process to maximize Advocat shareholder value; and (ii) refraining from adopting any measures designed to preclude strategic transactions and further entrench the members of the Board in their positions with Advocat.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction in this case arising under 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Advocat maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Advocat's shareholders, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12. Plaintiff Frank Rossello is a shareholder of Advocat and has been at all relevant times. Plaintiff is a citizen of California.

13. Defendant Kelly J. Gill ("Gill") is Advocat's President, Chief Executive Officer ("CEO"), and a director and has been since November 2011. Gill was also Advocat's Chief Operating Officer from April 2010 to September 2011. Advocat paid Gill the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $337,500 | $136,688 | $32,300 | $109,500 | $20,417 | $636,405 |

Gill is a citizen of Tennessee.

14. Defendant Olson is Advocat's Chairman of the Board and has been since October 2002 and a director and has been since March 2002. Advocat paid Olson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Equity Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $81,500 | $1,700 | $16,815 | $100,015 |

Olson is a citizen of Tennessee.

15. Defendant McCurdy is Advocat's Vice Chairman of the Board and has been since July 2011 and a director and has been since March 2008. Advocat paid McCurdy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Equity Awards | Total |
|---|---|---|---|
| 2011 | $69,000 | $1,700 | $70,700 |

McCurdy is a citizen of Texas.

16. Defendant William C. O'Neil, Jr. ("O'Neil") is an Advocat director and has been since the Company's inception in 1994. Advocat paid O'Neil the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Equity Awards | Total |
|---|---|---|---|
| 2011 | $84,000 | $1,700 | $85,700 |

O'Neil is a citizen of Tennessee.

17. Defendant Richard M. Brame ("Brame") is an Advocat director and has been since December 2002. Advocat paid Brame the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Equity Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $72,500 | $1,700 | $12,610 | $86,810 |

Brame is a citizen of Tennessee.

18. Defendant Robert Z. Hensley ("Hensley") is an Advocat director and has been since July 2005. Advocat paid Hensley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Equity Awards | Total |
|---|---|---|---|
| 2011 | $74,500 | $1,700 | $76,200 |

Hensley is a citizen of Florida.

## THE DEFENDANTS' FIDUCIARY DUTIES

19. The officers and directors of a publicly traded corporation owe the highest duties of loyalty, good faith, fair dealing, and care to shareholders. In accordance with their duties of loyalty and care, the Defendants, as officers and/or directors of Advocat, are obligated to:

(a) objectively evaluate any reasonable proposed transaction, including the Offer, to determine whether it is in the best interests of the Company, its public shareholders, and the Company's other constituencies;

(b) refrain from contractually prohibiting themselves from complying with their fiduciary duties;

(c) refrain from participating in any transaction in which their loyalties are divided; and/or

(d)     refrain from placing any unreasonable or preclusive hurdles to a potential acquisition of the Company.

20.     Plaintiff alleges herein that the Defendants, separately and together, have violated and are continuing to violate the fiduciary duties they owe to plaintiff and the Company's other public shareholders, including the duties of loyalty and due care. Defendants' actions are preventing an open and fair process to maximize Advocat shareholder value. Moreover, the Defendants' actions will have a preclusive effect of preventing shareholders from making their own independent choice regarding Covington's non-coercive Offer, and dissuade additional offers for the Company.

21.     Indeed, by failing to adequately consider the Offer, the Defendants cannot possibly satisfy their duties of care and loyalty.

22.     As a result of their failure to consider value-maximizing alternatives in good faith, the Defendants, as a matter of law, have breached their fiduciary duties of good faith and fair dealing owed to the Company and its shareholders.

## BACKGROUND

23.     The long term care profession encompasses a broad range of non-institutional and institutional services. For those among the elderly requiring temporary or limited special services, a variety of home care options exist. As needs for assistance in activities of daily living develop, assisted living facilities become the most viable and cost effective option. For those among the elderly requiring much more intensive care, skilled nursing center care may become the only viable option. Advocat has chosen to focus its business on the skilled nursing centers sector. Advocat provides long term care services to nursing home patients in eight states in forty-six skilled nursing centers containing 5,364 licensed nursing beds, primarily in the Southeast and Southwest United States.

24.     Although the provision of health care services entails an inherent risk of liability, Advocat's recent legal track record sparks legitimate concerns. Advocat has been subject to an increasing number of lawsuits alleging malpractice, negligence, product liability, or related legal theories, many of which involve large claims and significant defense costs. As of December 31, 2011, Advocat was engaged in thirty-eight professional liability lawsuits. Four lawsuits are currently scheduled for trial or mediation by November 2012. Moreover, as admitted by Advocat, these professional liability costs, which have been consistently growing, are material to the Company's financial position. Advocat's professional liability expense was $11 million, $5.4 million, and $8.2 million for the years ended December 31, 2011, 2010, and 2009, respectively. Indeed, these amounts are material in relation to the Company's reported net income from continuing operations for the related periods of $1.4 million, $4 million, and $1.9 million, respectively. The total liability recorded at December 31, 2011, was $19.4 million, compared to the Company's current assets of $45.3 million and total assets of $116.7 million. These figures are made even more alarming considering the fact that Advocat's liability insurance coverage is substantially less than the amount required to satisfy claims that are expected to be incurred.

25.     Indeed, Advocat's increasing professional liability expense is crippling the Company's financial results. Just two days prior to the public announcement of the Offer, Advocat reported a first-quarter net loss of $1.5 million as it coped with higher costs. A substantial portion of the Company's net loss is attributed to a $0.6 million year-over-year increase in professional liability expense. The Company's 2011 financial results were mired by these rising professional liability expenses, which increased by $2.3 million compared to 2010.

26.     Advocat's market value has been steadily falling due to its continuously rising legal liability, much of which is absorbed by the Company and not insurance carriers. As a result, the

Company faces substantial risks to its continuance as a going-concern, further increasing the Company's need for greater financial support. Covington, who itself is a growing provider of long-term care services in Florida, Ohio, and Tennessee, is providing Advocat the opportunity for more stable financial support with its Offer.

27.     In addition to the rising professional liability expenses, Advocat is facing serious regulatory, reimbursement, and business headwinds. The largest impact comes from recent changes in government reimbursement. Specifically, in August 2011, CMS issued a final regulation that reduced Medicare payments to all skilled nursing facilities beginning October 1, 2011, by an estimated 11.1%. According to the Company's former Chief Financial Officer ("CFO"), Glynn Riddle ("Riddle"), "this is a dramatic change in our reimbursement rate and will necessitate reevaluation of our efforts and statistic plan."

28.     Not surprisingly, Advocat's myriad legal issues and struggling financial outlook have led certain of the Company's most prominent executives to recently resign. First, William R. Council, III, resigned as CEO and director of Advocat effective September 30, 2011. Soon thereafter, on December 20, 2011, Riddle, the CFO of Advocat, announced his resignation as of March 31, 2012.

## THE BOARD REFUSES TO NEGOTIATE

29.     Despite the Company's debilitating liabilities, disastrous recent financial results, and substantial uncertainty about its future prospects, the Board has refused to participate in any meaningful discussions with Covington about a transaction that could increase shareholder value. Covington has presented the Board with "compelling proposals" in letters on February 27, March 22, and April 12, 2012, in response to which the Board has expressed "no interest in a discussion." The Board failed to reasonably discuss value or engage in any negotiations with Covington, despite the

substantial premium represented by the Offer, the non-coercive nature of the Offer, and Covington's confidence in its ability to fully finance a transaction, which it believes would not encounter any regulatory delays. Indeed, McMullan assured Advocat that Covington was able to complete the purchase of Advocat without a "financing contingency." Notably, Covington's Offer was based solely on publicly available information, without the benefit of any due diligence.

30. In addition to its extensive attempts to engage the Board in discussions, Covington even submitted that it would be "prepared to consider increasing the price" of the Offer should Advocat demonstrate in its negotiations and during due diligence "that there is greater value than is apparent from publicly available information."

31. Unable to engage the Board in any meaningful dialogue, on May 11, 2012, Covington disclosed the Offer publicly in a press release, which also included an open letter to defendants Olson and McCurdy. The press release and letter stated:

> ATLANTA, May 11, 2012 /PRNewswire/ -- Covington Investments, LLC (together with its affiliates ("Covington")), today submitted a non-binding proposal to acquire all outstanding common shares of Advocat Inc. (AVCA) for $8.50 per share in cash in a negotiated transaction. Covington is a privately owned and growing provider of long-term care services in Florida, Ohio and Tennessee. In a letter sent to the Company's Board of Directors this morning, Covington details, among other things, that its ***proposal represents certain and substantial value for Advocat's shareholders at an approximate 100% premium*** over the Company's unaffected share price and ***expresses its desire to open negotiations aimed at reaching a mutually agreeable transaction***. The consummation of the transaction ***would not be subject to a financing contingency***, nor does Covington believe the transaction would encounter regulatory delays. The full text of the letter, made public for the benefit of all Advocat shareholders, follows:
>
> May 11, 2012
>
> Board of Directors
> Advocat Inc.
> 1621 Galleria Boulevard
> Brentwood, Tennessee 37027
> Attn: Mr. Wallace E. Olson, Chairman of the Board
> Mr. Chad A. McCurdy, Vice Chairman of the Board

Dear Messrs. Olson and McCurdy:

In letters on February 27, March 22, and April 12, 2012, we made what we believe to be very compelling proposals to acquire Advocat Inc. ("Advocat") in a transaction that would provide substantial value to your shareholders. We were *surprised and disappointed that Advocat's Board of Directors has shown no interest in a discussion to explore our acquisition proposal. We are confident your shareholders would want and expect the Board to explore with us the possibility of such a compelling transaction*. We, therefore, have decided to make our proposal public in order to inform Advocat's shareholders of the significant value they could receive in a transaction with Covington.

*We remain interested in pursuing discussions in a mutually agreeable and negotiated manner if possible*.

To reiterate the key terms of our proposal, we have submitted a non-binding indication of interest to acquire all of the outstanding shares of common stock of Advocat at a *price of $8.50 per share in cash in a mutually agreeable and negotiated transaction* (the "Proposal"). The Proposal values Advocat's common shareholders' equity at approximately $51 million, or approximately $44 million excluding the shares already owned by Covington's affiliates. As you know, this price was increased from our initial indication of interest on February 27th of $7.50 per share to be responsive to the Advocat Board's indication that such price was not sufficient to discuss a combination.

It is our view that our *proposed $8.50 per share offer represents an extraordinary value to shareholders of Advocat as the price represents*:

*a 96% premium above the closing price of $4.34 on May 10, 2012*;
*a 71% premium over the average closing share price during the past 30 days*;
*a 55% premium over the average closing share price during the past 90 days*; and
*a 47% premium over the average closing price during the past three years*.

Additionally, the last time shares of Advocat closed at or above $8.50 per share was more than two and a half years ago in November 2009.

Our Proposal represents a multiple of the following:

6.0x *enterprise* value to latest twelve months EBITDA, compared to the comparable public company[1] average of 5.2x; and
7.3x *adjusted* enterprise value[2] to latest twelve months EBITDAR, compared to the comparable public company[1] average of 6.3x.

Since Advocat's earnings per share have been negative for the twelve month period ending March 31, 2012, this offer is even more compelling when compared to the comparable public company[1] average price to earnings multiple of 9.0x.

*We do not understand how the Board's unwillingness to even discuss our Proposal in favor of an uncertain and questionable standalone strategy can serve the best interests of Advocat's shareholders*. In light of Advocat's financial performance, as evidenced most recently in its first quarter earnings release on May 9, 2012, we are even more puzzled by the Board's refusal to entertain our Proposal. We believe, based on an extensive review of public information about Advocat, that our proposed purchase price is a full and fair one. As we have indicated to you, *if Advocat's Board does not believe that our Proposal represents attractive value, we think it would be a better course for you to provide us with access to non-public information so that you can explain where you see greater value. If you can demonstrate that there is greater value than is apparent from publicly available information, we would be prepared to consider increasing the price of our Proposal*.

This letter and our Proposal is an expression of Covington's interest only, and neither this letter nor any course of dealing shall constitute an agreement in principle or a legally binding offer or otherwise legally obligate either Covington (or any of its affiliates) or Advocat to proceed with or consummate any transaction unless and until a definitive agreement is executed. We reserve the right to discontinue discussions regarding, and withdraw, our Proposal at any time. Our Proposal is subject to customary conditions, including, among other things, our satisfaction with the results of due diligence, the negotiation of a mutually satisfactory definitive agreement, and receipt of approval by Advocat's primary landlord, Omega Healthcare Investors, Inc.

As we mentioned in our prior letters, Covington has held extensive discussions with our financing sources regarding this potential opportunity. In addition, Covington's recent successful closing of a $98 million syndicated credit facility to fund their acquisition and refinance existing debt gives us the confidence that we will be able to *close in a timely manner on the purchase of Advocat without a financing contingency*. Supplying us with the non-public information we have requested will allow us to expedite the completion of necessary due diligence and execution of appropriate definitive agreements.

Our team of financial advisors, Avondale Partners, LLC, legal advisors, Bass Berry & Sims PLC and Baker Donelson Bearman, Caldwell & Berkowitz, PC, and financing sources are standing by to assist with the due diligence and transaction process. Given our team's understanding of the long-term care sector and skilled nursing facilities in particular, we are able to complete such due diligence expeditiously and with minimal disruption if given access to management and upon receipt of relevant information. Upon execution of a definitive agreement, there would not be a financing contingency and we do not anticipate any regulatory delays.

Given our willingness to propose a purchase price at an attractive premium, as well as the regulatory, reimbursement and business headwinds facing Advocat, we believe it is *very much in your shareholders' best interests for you to start a dialogue with us about our Proposal and provide us with access to the relevant company information. Your continuing refusal to engage with us only serves to delay and deny your shareholders the opportunity to consider this compelling transaction*.

We look forward to discussing this transaction further with you.

Sincerely,

/SIG/

John E. McMullan
President
Covington Investments, LLC

32.     Just hours after the press release and letter were publicly released, Advocat filed an amendment to its Schedule 13D filed with the SEC on Form SC 13D/A.  The Form SC 13D/A reiterated Covington's publicly announced Offer and the letter sent to defendants Olson and McCurdy.  The Form SC 13D/A stated, in part:

> *On May 11, 2012, Covington Investments, LLC ("Covington"), an affiliate of the Reporting Persons, issued a press release announcing that it has submitted a non-binding proposal to acquire all outstanding common shares of the Issuer for $8.50 per share in cash in a negotiated transaction*. A copy of the press release is attached hereto as Exhibit G and is incorporated herein by reference. As described in more detail in the press release and related letter to the Issuer's Board of Directors (the "Board"), *Covington noted that the proposal represents a premium of 96% over the Issuer's closing price on May 10, 2012.  Covington also noted that the consummation of the transaction would not be subject to a financing contingency and that Covington does not believe the transaction would encounter regulatory delays*.
>
> *Covington's press release stated that following several unsuccessful attempts to engage the Issuer in discussions regarding its proposal, Covington has decided to make its proposal public in order to inform the Issuer's shareholders of the significant value they could receive in a negotiated transaction with Covington*.
>
> *In the letter to the Board, Covington stated it believes the Issuer's shareholders would expect the Board to explore Covington's proposal, and that it did not understand how the Board's unwillingness to even discuss its proposal in favor of an uncertain and questionable standalone strategy can serve the best interests of the Issuer's shareholders*. Covington requested that, if the Board does not believe that the proposal represents attractive value, that the Issuer provide Covington with access to non-public information to explain where the Board sees greater value, and that if there is greater value than is apparent from publicly available information, Covington would be prepared to consider increasing the price of its proposal.
>
> In concluding the letter, Covington reiterated its willingness to engage in constructive dialogue with the Issuer about its proposal, and that the Board's

continuing to refuse to engage with Covington only serves to delay and deny the Issuer's shareholders the opportunity to consider its compelling proposal.

33.    Then on May 14, 2012, Advocat filed a Form 8-K with SEC officially rejecting Covington's Offer.  The Defendants' refusal to negotiate is not the product of valid business judgment.  Without engaging in any meaningful discussions with Covington or its advisers regarding the Offer, the Board has failed to obtain and consider all reasonably available information.  The Board instead has flatly rejected Covington's advances.

34.    The Board's recent misconduct is in line with Advocat's previous history of implementing draconian antitakeover defenses.  Advocat has had a poison pill in place since 1998, which essentially gives the Board the power to flood the market with additional shares so that buying the Company in a hostile takeover would become prohibitively expensive and difficult.  Here, the poison pill would prevent Covington from acquiring Advocat, regardless of shareholders' support for the Offer communicated to them on May 11, 2012.  In addition, Advocat's Board is staggered, with certain directors serving different term lengths than others.  Having a staggered board deprives Advocat shareholders the control that comes from the opportunity to elect the full Advocat Board at any one time.  The Defendants' use of such draconian antitakeover defenses in order to selfishly protect their own positions at the Company would not be the product of valid business judgment.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action individually and as a class action on behalf of all holders of Advocat stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

36.    This action is properly maintainable as a class action.

37.     The Class is so numerous that joinder of all members is impracticable. According to Advocat's SEC filings, there are more than 5.8 million shares of Advocat's common stock outstanding.

38.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include the following:

(a)     whether the Defendants have breached any of their fiduciary duties to plaintiff and the other members of the Class, including the duties of good faith, due care, honesty, and fair dealing;

(b)     whether the Defendants, in bad faith and for improper motives, have impeded offers for the Company or its assets; and

(c)     whether the Defendants have irreparably harmed plaintiff and the other members of the Class.

39.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

40.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

41.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

42. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

43. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Claim for Breach of Fiduciary Duties Against the Defendants

44. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

45. By the acts, transactions, and course of conduct alleged herein, the Defendants have violated their fiduciary duties of good faith, loyalty, candor, and due care at the expense of plaintiff and other members of the Class.

46. As alleged herein, the Defendants have breached their fiduciary duties because, among other reasons, they:

      (a)     failed to adequately consider the Offer;

      (b)     failed to apprise themselves of the true value of the Company, or the benefits associated with pursuing the Offer or an alternate transaction, by, among other things, considering the merits of such transactions and engaging in a market check or canvas of the industry; and

      (c)     failed to otherwise take the steps necessary to comply with their fiduciary duties.

47. As such, unless the Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a

-16-

process that entrenches them in their prestigious and lucrative positions. Furthermore, absent injunctive relief, plaintiff and the Class will continue to suffer irreparable harm as a result of the Defendants' breaches of fiduciary duty, for which plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Preliminarily and permanently enjoining the Defendants from placing their own interests ahead of those of Advocat and its shareholders by failing to ensure an open and fair process to maximize Advocat shareholder value;

C.      Preliminarily and permanently enjoining the Defendants from initializing any defensive measure which may render the acquisition of the Company unduly burdensome or expensive for a potential acquirer;

D.      Imposition of a constructive trust, in favor of plaintiff and members of the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct and in breach of any duty owed to Advocat shareholders;

E.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such further equitable or other relief as this Court may deem just and proper.

DATED: May 16, 2012                          BARRETT, JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES

_____
s/George E. Barrett
GEORGE E. BARRETT

217 Second Avenue North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ARSHAN AMIRI
EDWARD B. GERARD
JUSTIN D. RIEGER
CONRAD B. STEPHENS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
soddo@robbinsumeda.com
aamiri@robbinsumeda.com
egerard@robbinsumeda.com
jrieger@robbinsumeda.com
cstephens@robbinsumeda.com

*Attorneys for Plaintiff*